208 N.J. Super. 264 (1984)
505 A.2d 220
PHILIP ERLICH, PLAINTIFF,
v.
FIRST NATIONAL BANK OF PRINCETON AND W. JEFFREY MAIDEN, DEFENDANTS.
Superior Court of New Jersey, Law Division Mercer County.
Decided December 12, 1984.
*274 Gerald J. Muller for plaintiff (Miller, Porter and Muller, attorneys).
Burtis W. Horner for defendant First National Bank of Princeton (Stryker, Tams and Dill, attorneys).
Daniel J. Sullivan for defendant W. Jeffrey Maiden (Murray, Hollander, Sullivan and Bass, attorneys).
LASSER, P.J.T.C. (temporarily assigned).
This is an action seeking damages for the claimed mismanagement of a custodian management account. It alleges negligence, malpractice, breach of fiduciary duty and breach of contract by the First National Bank of Princeton (Bank) and the manager of plaintiff's account, W. Jeffrey Maiden (Maiden). Plaintiff's principal contention concerns the concentration of his account in the stock of International Systems and Controls Corp. (ISC), an engineering, manufacturing and financial company engaged in providing services and products for the development of energy, agriculture and forestry resources. The following chart, prepared from the Bank's periodic reviews of plaintiff's portfolio, shows the concentration of the account in ISC stock.

*275
DATE OF # INVESTMENTS MARKET VALUE TOTAL #
REVIEW IN ACCOUNT OF ACCOUNT ISC SHARES
10/15/71 31 $109,358 100
01/15/72 33 178,179 900
04/15/72 17 268,233 2,000
10/15/72 6 363,502 2,300
12/29/72 6 319,678 2,220
04/06/73 6 218,295 4,840[*]
09/28/73 6 216,611 4,010
12/31/73 6 200,953 3,910
03/29/74 5 167,986 3,910
09/30/74 5 80,971 3,810
03/31/75 6 108,594 4,170
09/30/75 5 143,703 4,070
12/31/75 5 144,752 4,070
03/31/76 5 146,100 4,070
09/24/76 4 139,991 4,070
12/31/76 4 97,430 4,070
03/31/77 4 135,807 4,070
09/30/77 4 80,820 4,070
12/30/77 4 84,320 4,070
03/31/78 4 110,821 4,070
09/29/78 4 157,650 4,070
12/29/78 4 77,365 4,070
 PER SHARE % MKT.
DATE OF MARKET VALUE VALUE VALUE
REVIEW OF ISC ISC ACCT ISC
10/15/71 $ 6,200 $62 5.66%
01/15/72 56,700 63 31.82
04/15/72 228,000 114 85.00
10/15/72 333,500 77.8 91.76
12/29/72 297,480 76.98 93.05
04/06/73 198,440 41.45[*] 90.90
09/28/73 195,988 43.91 90.47
12/31/73 184,747 47.25 91.93
03/29/74 149,557 44.29 89.02
09/30/74 73,342 19.25 90.57
03/31/75 92,261 22.125 84.95
09/30/75 123,626 30.375 86.02
12/31/75 124,135 30.50 85.75
03/31/76 121,063 29.75 82.86
09/24/76 119,556 29.375 85.40
12/31/76 75,295 18 77.28
03/31/77 108,872 26.75 80.16
09/30/77 52,910 13 65.46
12/30/77 52,910 13 62.74
03/31/78 74,786 18.375 67.48
09/29/78 109,890 27 69.70
12/29/78 36,630 9 47.34

*276 THE FACTS
On May 12, 1971 plaintiff, a psychiatrist practicing in Princeton, New Jersey, opened a Custodian Management Account (CMA) with defendant Bank. The agreement entered into by plaintiff and the Bank provided for a nondiscretionary account, with the Bank periodically examining securities held in the CMA and recommending sales and purchases that, in the Bank's opinion, were in plaintiff's best interest. The agreement provided that no transaction could be executed without plaintiff's written authorization. Except for proxies, plaintiff would be sent all material received by the Bank from corporations in which the CMA was invested. In addition, the agreement exculpated the Bank from liability resulting either from its good faith recommendations or its failure to make recommendations. The daily management of the CMA was entrusted to defendant Maiden, a trust investment officer of the Bank. The CMA was reviewed at least semi-annually by the Bank's trust committee.
Plaintiff subscribed to and read various publications relating to the investment world, including Forbes, Business Week, Value Line, Barron's and Investor's Digest. In addition, he read the financial section of the New York Times daily, including the stock quotations. Plaintiff maintained a detailed record of all of his investments in a small brown ledger. He was a member and had been president of the Princeton Prospectors, an investment club.
Plaintiff had invested in stocks and bonds for approximately 15 years prior to opening his CMA with the Bank. During this period, he invested as much as $230,000 in a portfolio of 40 different securities purchased through several brokerage firms, and incurred $110,000 in losses, half of which had been recovered by 1971. Two years prior to opening his CMA, plaintiff borrowed $75,000 from the Bank to purchase stock. Plaintiff testified to the relative degree of risk of each security he owned *277 at the time his CMA was opened, opining that greater than half were of the high risk variety.
Plaintiff was dissatisfied with the results of his own investment decisions and was concerned about the burden his investing had imposed on his psychiatric practice, so he sought professional investment advice from the Bank, where he maintained his checking account. The Bank also held the mortgage on his home and was a fiduciary named in his will. Plaintiff discussed retention of the Bank for investment advice with an officer of its trust department. Plaintiff selected a custodian management account because he wanted the Bank's investment advice but wanted to retain control of the actual investment decisions. At the time he opened his CMA, plaintiff brought to the Bank a portfolio of securities worth approximately $140,000  $180,000, which was substantially all of his assets except for the house in which he lived.
Plaintiff's objectives in opening his CMA are in dispute. He contends that he sought conservative management and growth, but not growth at the expense of conservative management. Defendants claim that plaintiff sought above-average growth in a desire to outperform the market. The statement of "Account Objectives" on the Bank's New Account Information Sheet for plaintiff simply says "growth."
After opening his CMA, plaintiff made some trades through his other brokerage accounts outside the Bank between May and August 1971. Each of these transactions involved at least 100 shares, several were short sales,[1] and many were carried out without Maiden's advice or recommendation.
In August 1971 Maiden recommended ISC common stock to plaintiff as a possible investment. He provided plaintiff with a *278 report on ISC prepared by Hornblower Weeks, Inc., as well as other related materials. On August 26, 1971 plaintiff purchased 100 shares of ISC and followed Maiden's advice in funding the purchase with the sale of 200 shares of Compus-camp, Inc., 300 shares of GAF, Inc. and 100 shares of Great Lakes Dredge and Dock Co.
In late October 1971, ISC stock began to be purchased in significant quantities for plaintiff's CMA. Maiden discussed each purchase with plaintiff before obtaining his written authorization for the purchase. These purchases of ISC resulted in part from plaintiff's and Maiden's attendance at an August 1971 meeting at the Nassau Club in Princeton. The primary speaker at this meeting was Larry Lau, ISC financial vice-president in charge of public relations. Lau described the virtues of ISC as an investment, characterizing ISC as an emerging growth company. He forecast earnings of $10 per share in five years and $25 per share in ten years. Subsequent to the meeting, an additional 700 shares of ISC were purchased for plaintiff's CMA, and plaintiff purchased 100 shares for his wife through her account at Merrill Lynch. On November 3, 1971 an additional 200 shares of ISC were purchased for plaintiff's CMA, financed by a loan from the Bank. On November 17, 1971 the Princeton Prospectors Club, a private investors' stock club, commenced its purchase of ISC, partly because of plaintiff's influence as club president.
It is important to note that from May 1971 until February 1973, when plaintiff suffered a heart attack, hardly a business day went by that plaintiff and Maiden were not in communication regarding plaintiff's investments, either in person or by telephone, although plaintiff and Maiden disagree as to which of them initiated most of the telephone calls. Plaintiff often visited Maiden at the Bank to discuss his investments. Maiden would suggest securities from lists of recommended stocks prepared by the Bank. There were occasions when discussion of stock purchases was initiated by Maiden and occasions when it was initiated by plaintiff. Plaintiff and Maiden would discuss *279 the trading price of the suggested stock, the corporation's activities, products or services, and the prognosis of the long or short-term profitability of the corporation. After plaintiff's heart attack, communications between plaintiff and Maiden were less frequent, although occurring several times a week.
No stock was ever purchased or sold without plaintiff's written authorization. The Bank sent plaintiff confirmation slips and periodic investment review statements that plaintiff read and, by his own admission, understood.
On January 25, 1972 ISC was awarded a major contract, which resulted in a price rise in its stock. An additional 700 shares of ISC were then purchased for plaintiff's CMA, financed by the sale of plaintiff's New Jersey Turnpike Authority bonds. Between February 2 and 10, 1972, 400 shares of ISC were purchased through the Bank at plaintiff's request, with Maiden's approval. By this time the per share market price of the stock had risen $30 above plaintiff's initial investment price of $60 per share.
At about this time, Maiden began investing in ISC for his own account.
On May 22, 1972 the Bank's trust committee reviewed accounts at the Bank that contained holdings in ISC. After lengthy debate as to the appropriateness of ISC as an investment, the committee approved it as an investment for all accounts.
In August 1972 ISC announced the negotiation of two significant foreign contracts. On the strength of this announcement, 300 additional shares of ISC were purchased for plaintiff's CMA on August 14, 1972. The purchase was financed by a further loan from the Bank. Plaintiff used a portion of this loan to lend $6,500 to Maiden. Maiden had requested the $6,500 so that he could purchase additional ISC stock for his own account.
In the fall of 1972 the pre-split price of ISC reached $160 per share. Plaintiff testified that he suggested selling some ISC *280 stock while the price was high, but that Maiden told him the price was going to go to $200. Consequently, plaintiff said, no action was taken at that time with respect to the sale of stock. Maiden testified that there was no discussion of selling ISC stock at that point.
In anticipation of a price rise, plaintiff made a gift to his children in late 1972 of 80 shares of ISC.
In early February 1973 plaintiff suffered a heart attack and was hospitalized for approximately one month. During this period, plaintiff's wife spoke on the telephone with Maiden on at least one occasion and told him she was dissatisfied with the concentration of the account in ISC stock. She testified that she told Maiden of her concerns about the family's financial position and plaintiff's future earning capacity, and that she wanted all of the ISC sold to preserve some profit for her husband. She testified that Maiden defended ISC as an appropriate investment for plaintiff.
Plaintiff was advised by his wife that she thought his account was being mismanaged, that it should be more diversified and that he should sell his ISC stock. References to plaintiff's wife and her attitude towards ISC and Maiden arose from time to time in Maiden's conversations with plaintiff. Maiden testified that on several occasions he suggested to plaintiff that his holdings in ISC be reduced if they were a threat to his health or marriage, but that plaintiff did not wish to discuss the matter, and Maiden concluded that the issue was closed.
During the spring of 1973 the price of ISC fell significantly, despite the positive news of a two-for-one stock split and a possible listing on the American Stock Exchange. The market as a whole was characterized as a "bear" market, but the price of ISC was dropping at a faster rate than the overall market. This price drop caused increasing concern among Maiden, plaintiff and George McKeon, then head of the Bank's trust department. Maiden communicated with Larry Lau and arranged a meeting with the executive vice-president of ISC, Herman *281 Freitsch, during Freitsch's scheduled visit to New York. In mid-April 1973 plaintiff, Maiden, McKeon and Irving Ness, another ISC investor, traveled to New York for the meeting. During their return from the meeting, they agreed that ISC remained a good investment and should be retained. Plaintiff indicated his intention to report on the meeting to the Princeton Prospectors.
As a result of the meeting with Freitsch and the concern caused by the ISC price decline, Maiden prepared a report for the Bank's trust committee. He described ISC as a good investment, but recommended that it be placed on "hold," to be purchased only on a selective basis. This suggestion was adopted by the trust committee on April 26, 1973.
During April 1973 the price of ISC continued to decline. Plaintiff testified that at this point he was ordered by the Bank to sell stock to reduce his debt. Maiden testified that, to his knowledge, the Bank had taken no such action with respect to the loan, but, rather, that he advised plaintiff to sell 500-1,000 shares of ISC to protect against a possible margin call. Plaintiff authorized Maiden to sell 500 shares of ISC, 400 shares of Penril and 200 shares of Patent Management. The proceeds of these sales, along with the $6,500 repayment from Maiden, were used to reduce plaintiff's debt to the Bank.
On June 1, 1973, ISC was listed on the American Stock Exchange. Motivated in part by his concern about the ISC price decline, Maiden attended the June 1973 annual meeting of ISC, with Bank authorization. He taped the entire proceeding and, upon his return, McKeon and plaintiff listened to the tape. Maiden continued to be enthusiastic about ISC's growth potential.
Three weeks after the 1973 annual meeting, ISC announced the acquisition of a significant contract. This announcement precipitated a price rise in ISC from less than $20 per share to approximately $60 per share. However, another price decline soon followed. Maiden advised plaintiff to sell at least 500 *282 shares of ISC stock to reduce his potential risk. Plaintiff was reluctant, but did authorize sale of 330 shares on August 21, 1973 at $42.75 and $44.50 per share and, on Maiden's advice, temporarily invested the proceeds in U.S. Treasury Bills for possible reinvestment in ISC. On August 27, 1973 plaintiff sold 100 shares of the ISC stock held by his wife in her account at Merrill Lynch.
In September 1974, a short position in the market in ISC stock became apparent and on October 4, after a four-point price rise, 100 shares of ISC were purchased for plaintiff's CMA.
In December 1974, the price of ISC declined to $16 per share, significantly lower than the per share cost of any of plaintiff's ISC purchases. On December 13, 1974, without prior consultation with Maiden, plaintiff sold, at his wife's request, the remaining 100 shares of ISC stock held in her account at Merrill Lynch.
Beginning in January 1975, a series of articles by Alan Abelson containing negative comments about ISC appeared in Barron's. The initial article prompted Maiden to speak with Larry Lau of ISC about the allegations in the article. Lau refuted each of the charges in a telephone conversation that Maiden recorded and later played back for McKeon and plaintiff. Plaintiff's concerns having been alleviated, on January 24, 1975 he authorized the purchase of 200 shares of ISC stock at $24 a share. Additional articles by Abelson appeared in Barron's, and on each occasion Maiden would telephone Lau, tape Lau's response to the allegations and then play back the tape for McKeon and plaintiff. On at least one occasion, however, Maiden arranged for plaintiff to speak directly with Lau.
On March 13, 1975, plaintiff made a gift to his wife of 100 shares of ISC.
Throughout 1975 and 1976, the short position in ISC stock increased moderately. Maiden attended the annual meeting of ISC shareholders in late fall 1976, discussed the annual meeting *283 with plaintiff and remained optimistic about the company's potential for future success.
In mid-December 1976 there was a sharp decline in the price of ISC, almost reaching the December 1974 low of $16 per share. Maiden made several inquiries of ISC management. Although he did discover that the short position in ISC stock had increased substantially in only a ten-day period, he could discern no new adverse information. Maiden reported the results of this investigation to plaintiff. Maiden asserted that there was a "conspiracy of the shorts" that had a tendency to depress the price of the stock, but that since the shorts would ultimately be obliged to cover by purchasing the stock, this was a favorable rather than an unfavorable sign. Plaintiff testified that Maiden told him he expected ISC stock to go to $200 within two years, that the fundamentals were still good and that people were still buying ISC.
In January 1977, ISC management conducted a three-day presentation on the company for the benefit of bankers, investment advisers and others. As Maiden was well known to ISC management, he was invited, and they agreed to pay his expenses after Maiden informed them that the Bank would not pay for his travel. The meeting took place in Houston, Texas, February 21-24, 1977, and Maiden left the meeting convinced that ISC remained a good investment.
The day after Maiden's return from Houston, he reported his observations to plaintiff. Plaintiff was anxious to purchase an additional 300 shares of ISC. However, Maiden told him that no further purchases of ISC could be made through the Bank because, as of 1976, ISC had ceased to be on the Bank's recommended list. Plaintiff sought Maiden's assistance in executing the desired purchase outside the Bank. Maiden introduced plaintiff to one of Maiden's own brokers, and on February 25, 1977 plaintiff purchased 300 shares of ISC stock through this broker.
*284 Maiden had reduced his own ISC holdings during 1976, but shortly thereafter resumed his purchases of ISC in large quantities. As a result, he became seriously overextended financially. Bank management was aware of Maiden's personal investments in ISC, but was unaware of the size and number of his purchases. Bank policy did not prohibit personal investing by Bank personnel, provided such investing created no conflict with customer accounts. In fact, several members of Bank management, including McKeon and the Bank's president, owned ISC stock.
While Maiden was in Houston, McKeon learned of the extent of Maiden's personal investments in ISC through confirmation slips found in Maiden's desk. He confronted Maiden on February 25, 1977 when Maiden returned from Houston, and then reported Maiden's activities to Bank management and the trust committee. On March 10, 1977 Maiden was relieved of all of his duties in the trust department. The Bank had learned that the Securities and Exchange Commission had filed a complaint against Maiden concerning Maiden's transactions in ISC stock. On March 18, 1977, at the request of the Bank's president, Maiden resigned, and the Bank informed plaintiff that Maiden had left for "greener pastures."[2] Plaintiff contacted Maiden at home either that night or the next day. The two men agreed that plaintiff could call Maiden from time to time for any information Maiden had on ISC.
After Maiden left the Bank, plaintiff spoke with him from time to time concerning ISC and plaintiff's other investments. In September 1977 plaintiff was informed by Maiden that Maiden no longer owned any ISC stock. On one occasion in 1978, Maiden informed plaintiff that ISC had announced that it would be resuming payment of dividends on its preferred stock. On June 23, 1978 plaintiff purchased 300 shares of ISC preferred *285 stock for his two children through a broker suggested by Maiden. On September 12, 1978 plaintiff purchased 250 shares of ISC preferred stock for himself, without first discussing this purchase with Maiden.
Maiden testified that in November 1978 plaintiff asked him to "cooperate" in a suit against the Bank, in return for which plaintiff would not name Maiden as a defendant. Maiden told plaintiff that he could only relate the facts as he knew them. Maiden reported this conversation to the Bank.
Plaintiff maintained his CMA at the Bank for more than two years after Maiden's resignation. Clifford H. Seyfarth was temporarily assigned to plaintiff's CMA, and later, Joseph A. Gallagher was appointed as Maiden's replacement.
From March 1977 onward, plaintiff did not communicate with any Bank personnel, in spite of the fact that the Bank continued to impose its monthly charge for maintenance of his CMA and he received four letters from Seyfarth and Gallagher regarding his CMA. The first letter, dated April 28, 1977, simply invited plaintiff to contact the Bank if he was interested in discussing his account. Plaintiff did not respond. A letter dated October 19, 1977 suggested that he reduce the concentration of ISC in his CMA. A letter of May 24, 1978 recommended the sale of ISC and Threshold Technology and the acquisition of various other stocks. The final letter, dated October 19, 1978, came after plaintiff's attorneys had contacted the Bank regarding a possible claim. That letter urged plaintiff to attend to his CMA and advised that his doing so would not prejudice any claim he might have against the Bank. Plaintiff testified that he did not respond to any of the letters because he had lost confidence in the Bank and did not know what to do. The account remained inactive from August 1976 until it was closed in June 1979.
During the period September 1971 through August 1976 there were many securities transactions for plaintiff's CMA. A pattern emerges from these transactions: conservative holdings were not retained; aggressive growth stocks were bought *286 and sold and, over the period, the number of issues held dwindled. From August 1976 until the account was closed, the portfolio in the CMA remained unchanged and held only four stocks: 4,070 shares of ISC, 1,400 shares of Threshold Technology, 3,200 shares of Penril and 200 shares of International Proteins. On February 12, 1979, plaintiff commenced this action.

THE ISSUES
The principal issue in this case is the duty owed to plaintiff by the Bank and Maiden, the account manager. That duty is governed by the principles of contract, agency and tort law (both general and as applied in the investment community).
There are three types of securities accounts typically employed by banks and brokerage firms: a custodian account, a discretionary account and a custodian management account. The duty to the customer and the degree of management responsibility assumed vary with the type of account. In a custodian account, the responsibility to the customer is minimal, because the custodian merely holds, buys or sells, transfers or receives securities as directed by the customer. Maximum responsibility is assumed in a discretionary account. The manager assumes full responsibility for the buying and selling of securities without prior approval from the customer.
Plaintiff's account, a custodian management account (CMA), is an intermediate type of account. In a CMA, the customer's securities are held in the same manner as in a custodian account, except that the account manager gives advice to the customer on purchases and sales and the customer makes the final decisions. It is the degree of responsibility for this type of account that is in issue here.

The Exculpatory Clause
Plaintiff and the Bank entered into an agreement on May 12, 1971 entitled "Investment Management Account for Philip Erlich," the first provision of which reads as follows:

*287 1. Investment management. You [the Bank] will examine periodically investments in this account and recommend sales and purchases of investments which in your opinion are for the best interest of the undersigned. You will not be liable in any way for recommendations made in good faith nor for failure to make recommendations.
Defendants assert that the exculpatory clause in paragraph 1 of the CMA agreement relieves them from liability to plaintiff. It is their position that an exculpatory clause in a contract signed by private parties is enforceable, absent evidence that the agreement was not the product of arms-length bargaining. Plaintiff argues that the exculpatory clause is void against public policy.
As a general rule, the courts will not enforce an exculpatory clause if the party benefiting from exculpation is subject to a positive duty imposed by law or is imbued with a public trust, or if exoneration of the party would adversely affect the public interest. McCarthy v. Nat. Assn. for Stock Car Auto Racing, 48 N.J. 539 (1967); Mayfair Fabrics v. Henley, 48 N.J. 483 (1967); Hy-Grade Oil Co. v. N.J. Bank, 138 N.J. Super. 112 (App.Div. 1975); Kuzmiak v. Brookchester Inc., 33 N.J. Super. 575 (App.Div. 1955).
The policy of this State, expressed in both case law and statute, dictates that professionals be held to the standards of their professions in delivering services to clients. See Levine v. Wiss & Co., 97 N.J. 242, 246 (1984), and cases cited therein.
The emphasis on professional responsibility in this State can be seen in the recent Supreme Court decision of Rosenblum v. Adler, 93 N.J. 324 (1983). The court declared that imposing tort liability on an auditor for negligent performance of an audit on which plaintiff relied to his detriment would have the welcome result that:
[a]ccountants will also be encouraged to exercise greater care leading to greater diligence in conducting audits. See 44 Wash.L.Rev. at 177 (stating that `[a]lthough courts may be the poorest forum in which to formulate standards, civil liability is probably the most effective means ... of providing a sufficient incentive for the profession to undertake further self-regulation.'). [Id. at 351.]
*288 Further support can be found in the Professional Service Corporation Act, N.J.S.A. 14A:17-1 et seq., L. 1969, c. 232. This act enables professionals to incorporate for the purpose of providing professional services to the public but denies the professional the limited liability available to a corporation. The act gives an indication of the public policy respecting professional liability.
Defendants have held themselves out to be professional investment advisers, stating in the Bank's brochures that "we bring considerable experience to bear and the specialized knowledge we have gained in ... the management of money.... We are highly trained in the techniques of investment." "Plain Talk About Investment Advice," (1977); "Professional Management for Your Investments," (1977).
"It is clear that the term `professional services' is no longer limited to the traditional professions such as law and medicine." Autotote Ltd. v. N.J. Sports Expo. Auth., 85 N.J. 363, 371 (1981). "The essence of a professional service is that it involves `specialized knowledge, labor or skill and the labor or skill is predominantly mental or intellectual, rather than physical or manual.'" Burlington Tp. v. Middle Dept. Inspec'n Agency, 175 N.J. Super. 624, 631 (L.Div. 1980), quoting Atlantic Mutual Ins. Co. v. Continental Nat'l Amer. Ins. Co., 123 N.J. Super. 241, 246 (L.Div. 1973) (emphasis in original).
Unlike doctors and lawyers, who are self-regulated, investment advisers who hold themselves out to the public as having special knowledge and skill are not self-regulated. This distinction does not justify a holding that they may contractually exculpate themselves from negligent advice. To allow investment advisers to exculpate themselves from the mischief caused by their breach of duty would violate the public policy of this State. I hold that the exculpatory clause in the CMA agreement is void and unenforceable.
*289 I do not need to reach the merits of the contract claim, because I view this case as essentially one in tort. The general rule, which I adopt, has been stated as follows:
If the complaint states a cause of action in tort and it appears that this is the gravamen of the complaint, the nature of the action as ex delicto [i.e., sounding in tort] is not affected or changed by allegations in regard to the existence or breach of a contract, which may be disregarded as surplusage, or treated as matter of inducement, as where the contract merely serves to show the relation between the parties and the existence and nature of the duty out of which the liability in tort arose. To be construed in tort, however, the wrong ascribed to defendant must be the gist of the action, the contract being collateral. 1 C.J.S., Actions § 46.
See generally, W. Prosser, Law of Torts, Ch. 16 (1971). The contract created the relationship between plaintiff and defendants; the cause of action lies in tort.[3]

The Tort Claim

Contentions
Defendants view the relationship between plaintiff and the Bank as one involving a sophisticated investor who played an active role in, and maintained ultimate decision-making control of, a nondiscretionary account. The standard of care governing the adviser in that situation, defendants urge, is that set forth in the Rules of Fair Practice of the National Association of Securities Dealers ("NASD Rules"), the Rules of the New York Stock Exchange, and the Securities and Exchange Commission Rules. The "Know Your Customer" rule is:
Every member organization is required to use due diligence to learn the essential facts relative to every customer, every order ... and every person holding power of attorney over any account. NYSE "Know Your Customer Rule," Rule 405, NYSE Guide (CCH), ¶ 2405 (1978).
The "Suitability" rule has two formulations. The NASD rule is:

*290 In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer.... NASD Rules, Art. III, § 2.
The Securities and Exchange Act Suitability Rule is:
Every nonmember broker or dealer and every associated person who recommends to a customer the purchase, sale or exchange of a security shall have reasonable grounds to believe that the recommendation is not unsuitable for such customer. SEC "Suitability Rule," Securities and Exchange Act, 15b10-13, 17 CFR, § 240, 15b10-3.
Defendants contend that these standards were satisfied in the present case because the advice given was "what the customer wanted."
Plaintiff maintains that the Bank and Maiden owed him a higher degree of care than that urged by defendants because he was an unsophisticated investor, albeit one familiar with investment terms and procedures, who was paying for professional management advice for his CMA. He essentially views his purchase and sale authorizations as pro forma, and says that his authorization power did not limit defendants' duty to exercise due care in giving investment advice.[4] He argues that principles of tort law, particularly as applied in malpractice cases, dictate this higher degree of care. Plaintiff contends that defendants did not meet the standard of care required of a professional investment adviser because they failed to advise diversification and failed to advise sale of ISC stock. He further claims that Maiden lost his objectivity and thus failed to provide competent professional advice.
In response, defendants argue that such a high standard of care is inapplicable to a situation where a CMA customer is "running the account." With respect to the allegation that defendants had a duty to diversify plaintiff's account, they argue that diversification is only one possible standard by which their conduct should be judged. They suggest that an *291 alternative to the principle of diversification is a "single stock strategy."

DISCUSSION
A professional must exercise that degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field. St. Pius X House of Retreats v. Camden Diocese, 88 N.J. 571, 588 (1982); Hoppe v. Ranzini, 158 N.J. Super. 158, 163 (App.Div. 1978); In re Quinlan, 137 N.J. Super. 227, 257 (Ch.Div. 1975), mod., 70 N.J. 10 (1976). Industry custom and practice are commonly looked to for illumination of the appropriate standard of care in a negligence case. Fantini v. Alexander, 172 N.J. Super. 105, 108 (App.Div. 1980); Restatement, Torts 2d, § 299A at 73 (1965). The Bank offered plaintiff professional investment advisory services. This was not merely a brokerage account.[5] It is therefore the degree of care, knowledge and skill expected of professional investment advisers to which we must look for the standard of care.
There is a dearth of case law on this issue, but I find that the obligation of the investment manager to give prudent advice is the standard of care to be applied in this case. This is a higher standard of care than that found in the "Know Your Customer" and "Suitability" rules. Prudent advice includes: (1) knowing the customer, his assets and objectives; (2) diversifying investments; (3) engaging in objective analysis as the basis for purchase and sale recommendations and (4) making the account productive. See Bines, The Law of Investment Management (1979), Ch. 6 passim.
*292 The investment manager is not a guarantor; he has no crystal ball with which to predict with perfect certainty the behavior of a particular stock in the market. When judging the actions of the manager with the benefit of hindsight, incorrect advice is easy to detect. We hasten to point out, however, that incorrect advice is not necessarily negligent advice.

(1) Knowing the Customer
The duty to give prudent advice obligates the investment manager to carefully assess the customer's circumstances, both at the outset and during the term of the account. The customer's age, health, family obligations, assets and income stream (both current and prospective) should be evaluated to determine his ability to absorb losses in the event an investment is unsuccessful.
In its Statement of Basic Investment Principles, approved by the trust committee on June 26, 1973, the Bank recognized as much, saying:
1. Each trust and investment management account will have somewhat different assets and objectives. These must be clearly recognized, should be stated in writing, and will influence the development of policy for the account and the selection of individual securities within the framework of broad policy representing the attitudes and opinions of the bank, as modified from time to time.
The manager has a further obligation to periodically review the customer's affairs to insure that the investment strategy remains suited to the customer's current ability to protect himself against loss. Maiden testified that after his initial inquiry when plaintiff opened the account, he had no further discussions with plaintiff concerning his objectives.
The single stock strategy related by Gerald Loeb, The Battle for Investment Survival (1965), upon whom defendants rely, requires an investor to have a large cash reserve. Id. at 119. Plaintiff's annual income was not substantial. He had minimal assets beyond the securities in his CMA. When he opened his account in 1971, aside from securities, he had assets of $5,000 in savings, $5,000 in Series E bonds, a vacant lot *293 valued at $5,000, and $50,000 equity in the home he owned jointly with his wife. I find that it was not prudent of the Bank to use a single stock strategy for plaintiff, given his circumstances.
The obligation to give prudent investment advice imports the duty to make such recommendations as a prudent investor would act on "for his own account, having in view both safety and income, in the light of the principal's means and purposes." Restatement, Agency 2d, § 425(b) (1958). The prudence of the investment advice must be judged by objective standards. A manager's personal beliefs are largely irrelevant when measuring his conduct against the conduct of a prudent, objective adviser. See Bines, supra, at 1-24.
An investment adviser is charged with furthering the customer's investment objectives, but he has an ongoing duty to refuse to approve investment strategies that are desired by the customer but appear to the adviser to be imprudent and too risky for the customer. The adviser must keep in mind at all times "the preservation of the estate." Bines, supra, at 1-35, quoting Restatement, Trusts 2d, § 227(6) (1959). At a minimum, the "Suitability" rule requires this conduct, and I reject defendant's contention that they satisfied their obligation by giving the advice they thought their customer wanted.

(2) Diversifying investments
The accepted standard of professional performance is that which has "substantial support as proper practice by the profession." Alternate courses of conduct engaged in by the few do not establish the standard. Schueler v. Strelinger, 43 N.J. 330, 346 (1964).
The investment manager has an obligation to the customer to exercise prudence in diversifying investments in order to minimize the risk of large losses. Restatement, Trusts 2d, § 228 (1959). Frederick Todd, the investment expert for plaintiff, *294 and Joseph A. Gallagher, the former Bank officer who testified for defendants, agreed that diversification of investment is a fundamental principle of portfolio management. Todd testified that the benefits of a single stock strategy do not outweigh its risks, and Gallagher testified that diversification was necessary to minimize risk. They both recommended investment in many issues. Todd stated that no one stock should constitute more than 10% of the portfolio, and Gallagher was of the opinion that 5 to 7% should be the limit. Professor James Mofsky, who testified as an investment expert for defendants, stated that the investment adviser need not advise a diversified portfolio when the customer is in control of the account and dictating a different strategy. He said that a diversification strategy will produce a result equivalent to the market, but diversification of the portfolio is not the standard where the customer seeks to outperform the market.
I find that diversification of investment is the accepted practice, and given plaintiff's financial position, defendants had a duty to advise diversification of plaintiff's portfolio. Diversification has been the rule since the early case of Dickinson's Appeal, 152 Mass. 184, 25 N.E. 99 (1890). See Bines, supra, at 6-20 to 6-23. The results of the investment strategy employed by defendants demonstrate by negative implication the soundness of the principle of diversification as the best protection against loss. By way of illustration, see Commercial Trust Co. v. Barnard, 27 N.J. 332 (1958), in which the Supreme Court held that the duty to diversify was not breached where trustees of an investment account invested solely in government securities because they provide the best "protect[ion of] the trust assets from the hazards of the market." Id. at 343.
The Bank and Maiden owed plaintiff the duty to act with skill and care in accordance with industry practice, and to advise an investment strategy that, under the circumstances, was prudent. That duty encompassed an obligation not to recommend or approve purchases inconsistent with diversification. By the *295 spring of 1972, 80 to 90% of the assets (by market value) in the account were concentrated in ISC. The percentage of concentration remained within this range until the end of 1976. Thereafter, as the value of ISC declined, the percentage of concentration also declined.
From early 1972, substantially all of plaintiff's CMA assets were invested in ISC stock, on the advice of Maiden. Defendants contend that in so doing they were responding to the needs of their customer. Maiden advised plaintiff to purchase ISC stock because that is what he thought plaintiff wanted him to do.
In the case at bar, it was not only negligent to advise concentration in ISC, it was also negligent to advise concentration without fully informing plaintiff of the magnified risks of such a strategy. I hold that just as a physician has a duty to obtain the informed consent of his patient for a course of treatment, e.g., Perna v. Pirozzi, 92 N.J. 446 (1983), an investment adviser deviating from the standard practice of diversification must inform his customer of the risks accompanying concentration of a portfolio in a few issues. The customer of a CMA must be in a position to make an informed choice of whether to follow the advice to concentrate his portfolio. Although plaintiff had invested in the stock market for many years and was knowledgeable to some degree about the nature of the stocks in his CMA, he was not fully informed of the risks to him of a single-stock strategy.
If a customer's assets and cash reserves do not justify a single stock strategy but the customer nevertheless insists on concentrating his portfolio in a few aggressive growth stocks, abandoning diversification, the investment adviser, after informing the customer of the risks of concentration, should obtain the customer's express acknowledgement of the admonitions and his authorization to pursue this strategy. In essence, the customer would be expressly authorizing the investment *296 adviser to give advice that, by objective standards, might amount to malpractice.

(3) Engaging in objective analysis
A third aspect of the duty of care is to maintain objectivity in order to give investment advice that is in the customer's best interest. It is clear that Maiden lacked the objectivity necessary to give plaintiff prudent advice. He admitted in court that he was "obsessed" with ISC and "totally believed that the company was going to be a big success and was going to work out." Maiden's heavy investments in ISC and his conceded "infatuation" and "obsession" with the stock transformed him from an objective investment adviser into an advocate for ISC.
When negative articles about ISC began appearing in Barron's, Maiden's response was to seek commentary from Larry Lau, ISC's Vice President in charge of Public Relations. Maiden continued to elicit comments from ISC management, without seeking, for instance, an objective, outside opinion to verify or contradict the Barron's articles. ISC management and brokers who traded ISC stock were the source of the information that Maiden passed on to plaintiff. According to plaintiff, Maiden passed on information from the brokers that "buyers with suitcases of money" were sitting on the sidelines waiting to purchase ISC stock. Maiden told plaintiff that he had also learned from brokers that the "conspiracy of the shorts" would end to the detriment of the short sellers when they were required to buy stock to cover their short sales. There was no testimony that Maiden made or sought an independent investment analysis of ISC, the industry, its prospects or its risks.
The hallmark of a professional is the ability to exercise sound judgment in advising clients. The Bank acknowledged as much when it stated in one of its pamphlets that "Research, Vigilance and Responsible Judgment are three elements essential to the successful management of investments." [Capitals in original]. *297 "Professional Management for Your Investments," (1977), p. 1. Whether it was due to personal interest or lack of experience or lack of professionalism, it is clear that Maiden's advice was not based on independent, objective analysis.

(4) Making the Account Productive
The duty to make an investment portfolio productive is grounded in trust law, as a corollary of prudent investment, Restatement, Trusts 2d, §§ 181, 227 (1959), and agency law, Restatement, Agency 2d, § 425, comment a (1958). Bines, supra, at 6-19.
The Bank acknowledged this duty in its brochures by saying, "As a trust institution, our living depends on making money earn money," and further, "the good of your fund is more important than any impression we might make on you of alertness  of being always `on the ball'." "Plain Talk About Investment Advice," (1977), p. 4. The Bank's Statement of Basic Investment Principles, supra, states in part, "3 .... [e]ach account should have active supervision with careful attention to possibilities for improving income and capital performance by the exercise of imagination and initiative."
Defendants had the further duty not to speculate by purchasing volatile issues or leveraging the account when the portfolio was not diversified. Even Loeb, whom defendants cite for the proposition that a single-stock strategy is an acceptable mode of investment, has stated that it is necessary to "get out of long positions which begin to prove themselves wrong by declining in price. This is one automatic proceeding in handling securities, the only proceeding in which no judgment is needed." Loeb, supra, at 57. Loeb describes this situation as calling for following a "mechanical rule[:] ... losses must always be cut." Ibid.
Through the end of 1972, the market value of plaintiff's portfolio exceeded his cost. Beginning with the Bank's April 6, 1973 quarterly statement on his CMA, every quarterly report *298 through December 29, 1978 showed that the portfolio was worth less than plaintiff's "carrying cost," with the net value reflecting a paper loss ranging from approximately minus $79,000 to as much as minus $142,000.
Maiden and the Bank breached their duty to make plaintiff's account portfolio productive. Over a period of five years, they either recommended that plaintiff acquire additional shares of ISC or hold what he had, or approved plaintiff's requests that additional ISC be purchased. The only exceptions to this practice occurred in April and August 1973, when Maiden advised plaintiff to sell some ISC stock to protect himself against the risk of a price decline and a possible margin call. These recommendations to sell would not, in any event, relieve defendants from liability because the critical element of their breach of duty was their failure to advise diversification. I find Maiden negligent in failing to conform to the foregoing standards in his advice to plaintiff with respect to the account. I find the Bank negligent in its supervision and periodic review of the account, its failure to provide for diversification and its failure to consider the risks to plaintiff, given his financial circumstances.

COMPARATIVE NEGLIGENCE
New Jersey negligence law was changed on August 22, 1973, to substitute comparative negligence for contributory negligence. While prior to the change in the law any contributory negligence on the part of the plaintiff would have barred his claim altogether, Mattero v. Silverman, 71 N.J. Super. 1 (App.Div. 1962), under the new law, plaintiff's award is reduced by a percentage reflecting the comparative amount of his own negligence. Portee v. Jaffee, 84 N.J. 88, 101-102 (1980). Plaintiff cannot recover if his negligence outweighs the combined negligence of the defendants.
The Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq., applies to "causes of action arising on or after" the effective *299 date of the statute, August 22, 1973. L. 1973, c. 146 § 4. It is necessary to determine when the cause of action in this case "arose" in order to determine the applicability of the Comparative Negligence Act.
Maiden and the Bank engaged in a course of negligent conduct that continued throughout their professional relationship with plaintiff. The negligent acts at issue continued over several years beyond August 1973. "The malpractice in such cases is regarded as a continuing tort because of the persistence of the [professional] in continuing and repeating the wrongful treatment," in this case, of the customer's account. Tortorello v. Reinfeld, 6 N.J. 58, 66 (1950), followed by Lopez v. Swyer, 115 N.J. Super. 237 (App.Div. 1971), aff'd, 62 N.J. 267 (1973). See also, Hughes v. Eureka Flint and Spar Co. Inc., 20 N.J. Misc. 314, 316, 26 A.2d 567 (Cty.Ct. 1939) ("This wrong should be treated as single and continuous, not plural and discreet").
The concept of a continuing tort has its origins in medical malpractice cases, e.g. Lynch v. Rubacky, 85 N.J. 65 (1981); Lopez v. Swyer, 115 N.J. Super. 237, but it has also been applied to professional malpractice cases in other fields. See Farley v. Goode, 219 Va. 969, 252 S.E.2d 594 (1979) (dentist); Berry v. Zisman, 70 Mich. App. 376, 245 N.W.2d 758 (Mich. App. 1976) (attorney); see also, Muller v. Sturman, 79 A.D.2d 482, 437 N.Y.S.2d 205 (A.D. 1981) (general discussion of continuing representation doctrine).
The cause of action in the case of a continuing tort accrues at the time the professional relationship or course of treatment comes to an end unless, under the "discovery rule," the cause of action is deemed by the court to have accrued at some earlier point. Lopez, 115 N.J. Super. at 250. Continuing tort cases are generally analyzed in terms of the statute of limitations. However, in the case at bar, we are concerned not with the statute of limitations but with the date of the change in the law to a comparative negligence standard. I interpret the word *300 "arising" in Chapter 146, § 4 of the Laws of 1973 to be synonymous with the word "accruing." Thus, in this case we are concerned with the time of accrual.
In New Jersey, in order to determine whether the cause of action should be deemed to have accrued at some point earlier than the end of the professional relationship or course of treatment, the "discovery rule" is applied. This rule, which refers to plaintiff's discovery of his injuries, was set forth in Lopez v. Swyer, 115 N.J. Super. 237, as follows: "The cause of action does not accrue until plaintiff is or should be aware of his injury and its causal relationship to the negligent treatment." Id. at 248. In Mant v. Gillespie, 189 N.J. Super. 368 (A.D. 1983), a legal malpractice case, the court held that the cause of action accrues "when plaintiffs were or ought to have been aware of facts suggesting that they had sustained damage which was, or might be, attributable to the malpractice." The inquiry for time of accrual is two-pronged. The court must find that plaintiff: (1) had sustained damages and (2) "had an awareness of material facts" indicating that his injury might be traceable to the malpractice of the professional. Lynch v. Rubacky, 85 N.J. at 71.
Defendants' recommendations with respect to the purchase and retention of ISC stock continued until the October 19, 1977 letter from Gallagher for the first time recommended diversification. Plaintiff was aware that the stock had declined in value, but relied on defendants' continuing approval of the purchase and retention of ISC. Plaintiff engaged the Bank for its professional advice and was entitled to rely on that advice. It was not until the Bank recommended diversification of his portfolio and sale of ISC, and an SEC investigation came to his attention, that he had reason to know that the conduct of defendants might be the cause of his injury.
Plaintiff's position as an investor who sought professional management of his CMA is analogous to that of the patient in Lynch v. Rubacky, 85 N.J. at 75. The patient's feeling "that *301 something was `wrong'" was "not incompatible with a belief that her doctor was treating her fully in accordance with proper medical standards." The court continued, "moreover, as in this case, a doctor's repeated assurances of progress may reinforce the reluctance of an average patient to find medical fault. Hence it is extremely unlikely that [plaintiff], who was constantly encouraged by [defendant's] optimistic prognosis of healing, sensed the real possibility of malpractice." Ibid.
I recognize that the doctor-patient relationship and the investment adviser-client relationship are different, but there is a common thread inherent in both. In each case, a lay person is dealing with a professional. The lay person therefore reposes confidence and trust in the conduct and advice of the professional, and is not likely to question the professional unless his actions are flagrantly improper.
Plaintiff in the case at bar sought the expertise of a professional investment adviser because he was dissatisfied with his own ability to manage his investments. He was entitled to rely on defendants to give prudent advice to achieve his investment objectives. When it appeared that his account was suffering losses as a result of their advice, he was also entitled to expect that defendants' further advice to hold, not sell, ISC would restore profit to the account.
I find that plaintiff's cause of action did not arise until after he received the October 19, 1977 letter from Gallagher. The accrual of the cause of action having occurred after August 1973, the entire case comes under the rubric of the Comparative Negligence Act.
Plaintiff also was negligent in his conduct with respect to his CMA. "Contributory negligence is negligence on the part of the plaintiff that involves an unreasonable risk of harm to him and contributes as a legal cause to his injury ... [T]he unreasonableness of the plaintiff's conduct must have been in its tendency to expose him to the particular risk from which his injury resulted." Stoelting v. Hauck, 32 N.J. 87, 101 (1960). *302 Plaintiff failed to take any steps to protect himself against losses even after it became apparent that the concentration in ISC was failing to produce the profit he had anticipated. Maiden and plaintiff were caught up in the speculative zeal inspired by ISC's strong upward movement from 1971 to 1973. Thereafter, plaintiff's enthusiasm for this stock, fueled by Maiden's optimism and encouragement, continued until the stock became virtually worthless.
Plaintiff continued to purchase ISC in spite of the negative articles that appeared in Barron's in 1975 and the removal of the stock from the Bank's recommended list in 1976. In 1977 and 1978 he purchased preferred stock of ISC because, in his own words, he was "interested in doing what I could to revive the situation," "I was attempting to influence in my small way the price of the stock and also to perhaps try to revive my own spirits."
While I do not find that plaintiff was the "sophisticated investor" defendants portray him to be, he was sufficiently knowledgeable in securities investment to have become aware that Maiden was recommending an aggressive growth strategy without diversification. He was aware at all times of the status of his CMA and regularly discussed it with Maiden. Furthermore, there were outside indications that the course of action being followed in the management of the CMA was unwise. After plaintiff's heart attack, his wife voiced strong objections to the risk involved. Maiden suggested the sale of ISC if its retention would adversely affect plaintiff's health or marriage. Other indicators were the articles in Barron's and the substantial short position in ISC. Plaintiff ignored the warning signals. He neglected his CMA from March 1977 to June 1979, when the account was finally closed. Plaintiff is thus partly responsible for the loss he incurred.
Defendants are jointly and severally liable for plaintiff's losses, but plaintiff's award will be reduced by 40% because of his own negligence. Plaintiff's negligence is less than that of *303 defendants because defendants were the professionals charged with the duty to give prudent advice. I will reserve allocation of fault between the defendants until a hearing may be had on determination of damages.

WAIVER, ESTOPPEL AND RATIFICATION
Defendants have raised the further defenses of waiver, estoppel and ratification based on plaintiff's acquiescence in the investment strategy recommended by them. For the reasons set forth below, none of these defenses is a bar to plaintiff's claim.
The concept of ratification does not apply to a negligence claim. Ratification arises when one party, claiming that the other had no authority to act on his behalf, is found to have known of and assented to the allegedly unauthorized actions of the other. In the case at bar, plaintiff does not claim that defendants had no authority to act as they did. Rather, plaintiff claims that defendants acted without skill and care. See, e.g., Johnson v. Hospital Services Plan of N.J., 25 N.J. 134 (1957).
Consent is also not a defense to a malpractice claim. Consent would be a defense to a complaint of intentional tort, such as assault and battery. Krause v. Bridgeport Hospital, 169 Conn. 1, 362 A.2d 802, 806 (1975). In a negligence context, however, knowledgeable consent, at best, raises the spectre of the doctrine of assumption of the risk. See, W. Prosser, The Law of Torts, Ch. 11 at 440 (4th ed. 1971), a doctrine that is no longer a viable defense to a negligence claim in New Jersey. McGrath v. American Cyanamid Co., 41 N.J. 272 (1963).
Estoppel is not available to defendants in this negligence case. Defendants may not base a claim of estoppel in their favor on their own wrongful acts or dereliction of duty, or on acts by plaintiff induced by their conduct. The New Jersey Supreme Court stated the general rule as follows: "Estoppel *304 cannot be interposed to protect an active wrongdoer." Gould & Eberhardt, Inc. v. City of Newark, 6 N.J. 240, 244 (1951). Principles of equitable estoppel preclude defendants from taking advantage of their violation of their legal duty to exercise due care in giving plaintiff prudent investment advice. Cf. Rudikoff v. Byrne, 101 N.J. Super. 29, 37 (L.Div. 1968). See, generally, 28 Am.Jur.2d § 79.
Finally, in order for waiver to apply, a person must intentionally, knowingly and voluntarily relinquish, for valuable consideration, a right which he knows he has. West Jersey Title etc. Co. v. Industrial Trust Co., 27 N.J. 144, 152-153 (1958). There was no election by plaintiff to forego his malpractice claim in the event defendants failed to give him prudent advice, and a waiver will not be lightly inferred from conduct. Ibid.
Although acquiescent conduct constituting contributory negligence might, under other circumstances and in other legal contexts, constitute waiver or estoppel, in a negligence case those defenses are subsumed under the general rubric of comparative negligence and, to the extent relevant, I have considered that conduct in the comparative negligence context.

The Claim Against Maiden
Defendant Maiden contends that the complaint filed by plaintiff is couched in terms that indicate that the claim against him for damages is set forth only in count seven of the complaint and is only for his actions outside the scope of his employment. Plaintiff contends that the complaint is general in its terms with respect to both defendants and seeks damages from Maiden for his actions both within and without the scope of his employment. Plaintiff urges that a liberal construction be given to the complaint and cites R. 4:5-7.[6] In addition, he *305 has moved pursuant to R. 4:9-2[7] to amend the complaint to conform to the proofs, if such a motion is necessary.
I find that the wording of the complaint is sufficiently broad to encompass an action against Maiden for negligence both within and without the course of his employment. Although count seven is the only count that specifically seeks damages from Maiden individually, the "wherefore" clause of the complaint seeks damages from both defendants, and ¶ 49 of the seventh count incorporates and repeats all allegations made earlier in the complaint. Furthermore, in his answer to the complaint, Maiden responded by way of denial to each of the first six counts of the complaint, which he now contends do not apply to him.[8]
"In dealing with the legal sufficiency of the complaint, the plaintiff is entitled to a liberal interpretation of its contents and to the benefits of all its allegations and the most favorable inferences which may be reasonably drawn from them." Rappaport v. Nichols, 31 N.J. 188, 193 (1959). See also, R. 4:5-7. I therefore reject the contention of defendant Maiden that the claim against him is limited to damages for actions outside the scope of his employment.
There is insufficient proof to establish that the negligent acts of Maiden were outside the scope of his employment. I find that Maiden, while an employee of the Bank, was acting within the scope of his employment, and I base that finding on the supervision of Maiden by Bank management and the periodic review of plaintiff's portfolio by the trust committee.
The foregoing reasoning would permit amendment of the complaint. I am therefore allowing an amendment of the *306 complaint to conform to the proofs, as permitted by R. 4:9-2. See 68th St. Apts. Inc. v. Lauricella, 142 N.J. Super. 546, 561 n. 3 (Law Div. 1976), aff'd o.b. 150 N.J. Super. 47, 48 (App.Div. 1977).
I find that Maiden was on notice from the outset of the case that plaintiff sought damages from him for negligently performing his duties as an investment adviser. Furthermore, Maiden actively participated in the case. Maiden has, therefore, had adequate opportunity to meet the contentions of the complaint. See Cola v. Packer, 156 N.J. Super. 77 (App.Div. 1977).

CROSSCLAIMS
The Bank has filed a crossclaim against Maiden for indemnification for any damages it may have to pay plaintiff.
As a general matter, an employer who "has been compelled to pay damages to a third person for the negligence of his ... employee ..." has a common law right to maintain an action for indemnification over against the employee. Frank Martz Coach Co. v. Hudson Bus, etc. Co., 23 N.J. Misc. 342, 346, 44 A.2d 488 (Sup.Ct. 1945), and cases cited therein. The right to indemnification is predicated on the employer being only secondarily liable for the injuries sustained by the plaintiff. Where both employer and employee are at fault, the right to indemnification disappears. Schramm v. Arsenal Esso Station, 124 N.J. Super. 135, 138 (App.Div. 1973), aff'd, per curiam o.b., 63 N.J. 593 (1973); Hut v. Antonio, 95 N.J. Super. 62 (L.Div. 1967); cf. Adler's Quality Bakery, Inc. v. Gaseteria, 32 N.J. 55, 80 (1960) "should Gaseteria be able to prove itself or its agents free from any fault contributing to the accident, then it is entitled to indemnity from a person whose fault in fact caused it"). The Bank, by virtue of its joint liability with its employee, Maiden, is not entitled to indemnification.
Maiden has crossclaimed against the Bank for both contribution and indemnification. His claim for contribution is *307 premature, for the right to contribution from a joint tortfeasor does not exist until the claimant has paid the plaintiff more than the claimant's pro rata share of the judgment. Contribution Act, N.J.S.A. 2A:53A-3. In any event, the Contribution Act considers employer and employee as a single tortfeasor, and the right to contribution would thus not be available in this case. N.J.S.A. 2A:53A-1. See Marley v. Palmyra Boro., 193 N.J. Super. 271, 298 (L.Div. 1983) (borough administrator cannot recover contribution from Borough, his employer). Maiden's crossclaim for contribution must be dismissed for failure to state a claim on which relief can be granted.
As to Maiden's claim for indemnification, "there is a general rule in the law of agency that an employer cannot be compelled to reimburse an employee for damages the employee may be obligated to pay because of personal injuries to others resulting from his own negligent conduct." Hagen v. Koerner, 64 N.J. Super. 580, 585 (App.Div. 1960) (emphasis omitted); Restatement, Agency 2d, § 440 (1958). Maiden's status as a joint tortfeasor and employee whose own negligence caused the harm to plaintiff bars him from obtaining indemnity from the Bank.
All crossclaims are dismissed.

CONCLUSION
I conclude that defendants were negligent in failing to advise diversification of plaintiff's portfolio and that negligence terminated as to Maiden when he left the employ of the Bank on March 18, 1977, and terminated as to the Bank when it advised diversification in its letter of October 19, 1977, to which plaintiff did not respond. I conclude that plaintiff was also negligent and that his negligence contributed to his losses. I have allocated the fault 60% to defendants jointly and 40% to plaintiff. The court will fix a trial date for a determination of damages.
NOTES
[*] Figures reflect a 2:1 stock split
[1] Short selling occurs when a seller sells shares of stock he does not own and then borrows the same number of shares and delivers them to the purchaser. When the seller later purchases shares for return to the lender, he hopes to purchase them at a lower price, thus making a profit.
[2] Thereafter, the Bank conducted an investigation of all accounts managed by Maiden and concluded that there were no irregularities.
[3] Plaintiff alleged that the Bank fraudulently induced him to enter into the CMA. This claim was not established at trial.
[4] Plaintiff concedes that the standard of care is not greater because the entity rendering the services is a bank, rather than a brokerage firm or an independent investment adviser.
[5] Case law, including Leib v. Merrill Lynch, Pierce, Fenner and Smith, 461 F. Supp. 951, 953 (E.D.Mich. 1978), aff'd, 647 F.2d 165 (6th Cir.1981), analyzing the relationship between brokers and their customers is distinguishable from the case at bar. Brokers are engaged to execute stock transactions and are paid sales commissions. Investment advisers are engaged to give advice and are paid based on the value of the portfolio.
[6] "All pleadings shall be liberally construed in the interest of justice."
[7] "Such amendment of the pleadings ... as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time...."
[8] On the other hand, in its Answer, the Bank gave no answer to count seven, stating that it did not apply to the Bank.