Steven KRAMER

v.

Jeffrey S. NOWAK.

Civ. A. No. 95–3170.

United States District Court,
E.D. Pennsylvania.

Dec. 12, 1995.

Steven M. Kramer, New York City, pro se.

Jeffrey S. Nowak, Law Office of Jeffrey S. Nowak, Philadelphia, PA, pro se.

*OPINION*

LOUIS H. POLLAK, District Judge.

## I. Background

This case arises out of two previous pieces of litigation. The first was an action brought in federal court in New Jersey by Lightning Lube, Inc. against Witco Corporation, in which Lightning Lube alleged violations of RICO and federal antitrust law, as well as fraud, breach of contract, and tortious interference.[1] In that action, Lightning Lube was represented by Steven Kramer and Jeffrey Nowak of the law firm Steven M. Kramer & Associates. Lightning Lube ultimately recovered a judgment in the sum of $11.5

million. The second action was a malpractice suit brought by Ralph Venuto, Lightning Lube's President, against Mr. Kramer. This action, apparently, was resolved through arbitration. Although the parties to the present lawsuit have not submitted any description or documentation of the malpractice action, and thus this court does not know the scope of the issues involved or whether it was submitted to court-annexed or private arbitration, the action appears to have focused on an allegation that Kramer negligently represented Lightning Lube, preventing it from recovering a significantly larger judgment in its suit against Witco. According to Kramer, the malpractice claim resulted in an arbitral award against him in the sum of $440,000.

Following Kramer's defeat in the malpractice action, he filed the present action, a suit against his former associate Jeffrey Nowak. The complaint asserts federal jurisdiction on the basis of diversity of citizenship, in that Kramer is domiciled in New York and Nowak is domiciled in Pennsylvania. The complaint alleges that the arbitral judgment "was based upon conduct engaged in by Mr. Nowak while he was an independent contractor for the plaintiff in the case entitled *Lightning Lube, Inc. v. Witco Corp.*, 802 F.Supp. 1180 (DNJ). The conduct consisted of miscalculation of prejudgment interest." Complaint, ¶ 5. Based on this description of Nowak's alleged misconduct, Kramer asserts a claim for contribution, in which Kramer seeks to shift a portion of the arbitral award onto Nowak. Kramer further asserts claims for negligence and for breach of contract.

## II. The Present Motion

Nowak has moved to dismiss or, in the alternative, for summary judgment. Nowak argues that he was Kramer's employee and not, as Kramer asserts, an independent contractor. Nowak also argues that (1) the contribution claim must be dismissed because there has been no finding that Nowak and Kramer were joint tortfeasors, (2) the negligence claim must be dismissed because the complaint does not assert any duty owed by Nowak and because the claim is barred by

---

**1.** For extensive descriptions of that case, see *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir.1993) and *Lightning Lube, Inc. v. Witco Corp.*, 802 F.Supp. 1180 (D.N.J.1992).

the statute of limitations, and (3) the breach of contract claim must be dismissed because the complaint does not assert that Nowak failed to fulfill a specific contractual provision.

On its face, Nowak's motion appears to seek dismissal under Rule 12(b)(6) on each of the claims, while seeking summary judgment under Rule 56 solely on the issue of whether Nowak was Kramer's employee. Despite this appearance, Nowak has submitted numerous exhibits, including several affidavits and various documents, which he relies on in support of his arguments for dismissal of the individual claims. Under Rule 12, these exhibits are material only if the motion to dismiss is converted into a motion for summary judgment. Rule 12 provides:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b).

It is possible that Kramer construes Nowak's motion as seeking summary judgment on all claims, not merely the independent contractor issue. In opposing the dismissal of the individual claims, Kramer, too, relies on the exhibits submitted by Nowak. Moreover, Kramer has submitted an affidavit of his own, which he relies on in opposition to all of Nowak's arguments. This affidavit, however, is the only submission Kramer has produced. Under the circumstances, in which it is unclear whether the movant intended to seek dismissal or summary judgment, and in which it is similarly unclear how the motion was construed by the nonmovant, I believe that the best course is to follow the dictates of Rule 12 and to notify the parties that I intend to treat the motion as one for summary judgment. Kramer will have two weeks following the issuance of this opinion in which he may, if he so elects, submit (1) a further response to the motion and (2) additional exhibits and affidavits.

Because both parties treated the motion as seeking summary judgment, not dismissal, on the independent contractor issue, this issue is now ripe for resolution, and I address it below. In addition, I discuss the doctrinal framework which—as I currently understand the matters in dispute—seems likely to provide the setting for the disposition of the remaining issues in the case.

### III. Facts Alleged

The factual allegations contained in the complaint are extremely skimpy, consisting of the single sentence quoted in full above: "The conduct consisted of the miscalculation of prejudgment interest." Nonetheless, affidavits submitted by both parties flesh out the background and details of this event.

According to Nowak, the two parties first met in July 1988, while Nowak was in his final semester at Rutgers University Law School in Newark, New Jersey. Kramer was a practicing lawyer with offices in Philadelphia and New York and had placed an advertisement seeking a law student to work on a large antitrust matter—*Lightning Lube, Inc. v. Witco Corp.*—pending in federal court. Nowak responded to the advertisement, was interviewed by Kramer in Kramer's Philadelphia office, and was hired by Kramer. At Kramer's instruction, Nowak then began working out of the client's office in Mt. Laurel, New Jersey. Nowak worked at Lightning Lube's office from June 1988 until shortly after the conclusion of the litigation sometime in 1993 or 1994.

By June 1989, Nowak had been admitted to the New Jersey bar, and Kramer placed Nowak's name on his letterhead as an associate of the firm "Steven M. Kramer & Associates." The letterhead also lists Lightning Lube's address—where Nowak worked—as the firm's New Jersey office. In addition to arranging that Lightning Lube provide office space to Nowak, Kramer also arranged that Lightning Lube pay Nowak's salary directly. Kramer nonetheless maintained strict supervision over Nowak's work. Every day, Nowak prepared a log detailing the work he had done that day; the log was faxed to Kramer's

New York office. All documents prepared by Nowak for the litigation were also faxed to Kramer for his approval. One fact to be noted about the relationship of the two parties is that Kramer often directed Nowak to sign Kramer's name to documents to be filed in the district court in New Jersey.[2] Thus, the documents Nowak filed in the Lightning Lube litigation contain only Kramer's signature.

Among the many papers Nowak prepared for the Lightning Lube litigation was a motion for prejudgment interest. This motion was prepared after the jury returned a judgment of approximately $11.5 million in compensatory damages and $50 million in punitive damages in favor of Lightning Lube. Both Kramer and Nowak agree that Kramer instructed Nowak to prepare the motion. Kramer claims that he "completely delegated the task to Mr. Nowak." Plaintiff's Ex. 1, ¶ 2. Nowak disputes this characterization:

I prepared a draft of the Motion and faxed it, and a copy of the underlying New Jersey authority, ... to Mr. Kramer for his review and approval. Mr. Kramer reviewed the Motion and approved of the prejudgment interest figure and method of calculation. Moreover, Mr. Kramer was fully aware of New Jersey's Rules of Civil Procedure regarding pre and post judgment interest rates and the method of calculation.

Def.'s Reply Certification, ¶ 4. Despite the disagreement over the degree of supervision exerted by Kramer over the prejudgment interest motion, it is agreed that Kramer directed Nowak to prepare it. Further, the motion bears Kramer's name, Nowak having signed it, as was the usual procedure between them.

The motion prepared by Nowak sought approximately $4 million in prejudgment interest. It was submitted while Witco's motion for judgment as a matter of law was pending. In an opinion addressing Witco's motion, Judge William G. Bassler of the Dis-

trict of New Jersey reduced the damages award, declining to accept the punitive damages award and cutting down the compensatory damages award by $2 million. As a result of these decisions, Judge Bassler approved prejudgment interest in the amount of $2 million, rather than the $4 million requested by Lightning Lube. *Lightning Lube, Inc. v. Witco Corp.*, 802 F.Supp. 1180, 1203 (D.N.J.1992). Represented by Kramer, Lightning Lube appealed several aspects of the district court ruling, but did not appeal the determination of prejudgment interest. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir.1993).

## IV. The Relationship Between Kramer and Nowak

Kramer's complaint characterizes Nowak as an independent contractor. Nowak has moved for summary judgment on the ground that he was Kramer's employee, not an independent contractor. According to Nowak's memorandum in support of this motion, "Plaintiff's entire action is premised upon a theory that the Defendant was an independent contractor hired by the Plaintiff. Plaintiff's entire claim rises or falls on this legal theory." Def.'s Mem., at 15. No authority was cited by either party to explain the legal consequences that flow from Nowak's status as an independent contractor or, in the alternative, as an employee. Accordingly, on September 22, I directed the parties to supplement their memoranda to explain the importance of this distinction. Although I conclude that Nowak has established that he was Kramer's employee, the additional materials submitted by the parties persuade me that this conclusion does not mandate dismissal.

### A. Choice of law

█ A federal court sitting in diversity must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor*

---

**2.** According to Nowak's affidavit—which is, as to this, uncontroverted—"[D]ue to logistics, i.e., Mr. Kramer working out of the New York office, Mr. Kramer often requested that I sign his name to pleadings, letters and other documents after his final review in order to create an original document for filing." Cert. ¶ 8. Nowak has produced additional documentation substantiating this assertion. *See* Def.Ex. E–1, 2 (letters in which Kramer asks Nowak to sign Kramer's name to documents).

*Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). I therefore apply Pennsylvania choice-of-law rules to the determination of Nowak's employment status. The relationship between the parties—under either the independent contractor theory or the employee theory—was contractual in nature. Under Pennsylvania's choice-of-law principles for contract disputes, the state with the greatest interest in the controversy, and which is most intimately concerned with the outcome, provides the substantive law governing the dispute. *See In re Complaint of Bankers Trust Co.*, 752 F.2d 874, 881–82 (3d Cir.1984). In making this determination, a court must examine the following three factors: "(1) the place of negotiation, contracting, and performance of the contract in question; (2) the location of the subject matter of the contract; and (3) the parties' citizenship." *Shannon v. Keystone Information Systems, Inc.*, 827 F.Supp. 341, 343 (E.D.Pa. 1993) (citing *Reading Metal Craft Co. v. Hopf Drive Associates*, 694 F.Supp. 98, 104 (E.D.Pa.1988)).

■ The first of these three factors favors New Jersey. On the record that has been established, it is unclear where the contract was formed. It was advertised in New Jersey, while the interview took place in Pennsylvania. Nonetheless, it was Kramer's intention that Nowak work on the litigation at Lightning Lube's office in New Jersey. Thus, New Jersey was the site of performance of the contract. The second factor also favors New Jersey. The subject of the contract was the Lightning Lube litigation, a case filed in federal court in New Jersey by a New Jersey corporation. The third factor favors neither party, in that Kramer is a resident of New York, while Nowak is a resident of Pennsylvania. On these facts, it is clear that New Jersey law governs the nature of the contract between the parties. New Jersey has a strong interest in having its law govern a relationship such as this one that was centered primarily in New Jersey. In contrast, the two other states with relevant contacts—Pennsylvania and New York—have far weaker interests. Pennsylvania's only contacts are that Nowak is now a Pennsylvania resident and that the original interview between the parties occurred in

Pennsylvania. Kramer's law firm, Steven M. Kramer & Associates, has a Philadelphia office, but it also has offices in New Jersey and New York. Kramer may have performed some of his work on the Lightning Lube litigation from the Philadelphia and New York offices, but this fact is largely irrelevant to the contractual relationship between Kramer and Nowak, which focused on Nowak's work in New Jersey.

## B. Application of New Jersey Law

■ Under New Jersey case law, "An independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods and without being subject to the control of his employer as to the means by which the result is to be accomplished but only as to the result of the work." *Wilson v. Kelleher Motor Freight Lines, Inc.*, 12 N.J. 261, 96 A.2d 531, 533 (1953). In contrast, "[t]he relationship of master and servant exists 'whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or in other words, not only what shall be done, but how it shall be done.' " *Id.* (quoting *Cappadonna v. Passaic Motors, Inc.*, 55 A.2d 462 (N.J.Super.Ct.1947)). In short, "the determinative factor, according to all the adjudications, is the control retained." *Id.*

■ Nowak has produced considerable evidence that Kramer maintained control over Nowak's work. According to Nowak, Kramer required that he keep a log of the work he did for Lightning Lube and that Nowak fax this log to Kramer daily. Kramer also required that Nowak show him drafts of all work he prepared. Further, Nowak has introduced copies of written instructions given to him by Kramer, explaining how he was to proceed on different projects. Def.'s Ex. C–1, C–2, C–3, E–1, E–2, F–1, and F–2. Moreover, the letterhead for Steven M. Kramer & Associates listed Nowak as his "associate," and Kramer told both Lightning Lube and Judge Bassler that Nowak was his associate. Def.'s Ex. F–9, F–10, F–15, F–16, and F–36. A law firm associate is generally considered

the firm's employee. *See* Leonard Gross, *Ethical Problems of Law Firm Associates,* 26 Wm. & Mary L.Rev. 259 (1985); Cindy Holland, Comment, *The Liabilities and Ethical Responsibilities of a Law Firm Associate,* 16 J.Legal Prof. 241 (1991).

Kramer does not dispute any of these facts. Rather, Kramer points to the fact that Lightning Lube paid Nowak's salary as evidence of Nowak's independent contractor status. However, Kramer himself had apparently arranged that Nowak's salary would be paid by his client. That Lightning Lube paid Nowak does not cast doubt on the evidence that Kramer controlled Nowak's work. There is no evidence that Kramer's supervision of Nowak's day-to-day working life was at all affected because Lightning Lube paid Nowak directly, rather than indirectly through a fee payment to Kramer. Based on the record before the court, it is clear that Nowak was Kramer's employee.

Nowak asserts that this conclusion dictates that the case be dismissed. In support of this assertion, Nowak points to the well-established principle of respondeat superior, under which an employer can be deemed legally responsible for the torts committed by employees acting in the scope of their employment. *See Biase v. Kaplan,* 852 F.Supp. 268 (D.N.J.1994); *J.L. Querner Truck Lines, Inc. v. Safeway Truck Lines,* 65 N.J.Super. 554, 168 A.2d 216 (1961); Restatement (Second) of Agency § 219(1). Yet the principle of respondeat superior only establishes an employer's liability with regard to third persons injured by the employee's wrongdoing. The principle of respondeat superior does not immunize employees from breaches of duty committed within the scope of employment.

The Restatement (Second) of Agency provides that "[a]n agent is subject to liability for loss caused to the principal by any breach of duty."[3] Restatement (Second) of Agency § 401. The Restatement includes no exception for acts performed in the scope of employment. On the contrary, it states "[A] servant, who, while acting within the scope of employment, negligently injures a third person, although personally liable to such person, is also subject to liability to the principal if the principal is thereby required to pay damages." *Id.,* cmt. d. Under the Restatement, an employer may also sue an employee for contribution and breach of contract. *Id.* ("Where the negligence of both principal and agent combine in causing loss to a third person, the principal has a right to contribution in states in which this is permitted between tortfeasors."); *id.,* § 400.

Thus, while the determination that Nowak was Kramer's employee is relevant to certain issues considered below, it does not require that the suit be dismissed.

## V. Kramer's Contribution Claim

A contribution action allows a party who has paid more than its equitable share of liability to shift a portion of the liability to a joint wrongdoer. *See* Uniform Contribution Among Tortfeasors Act § 2(b) (providing that "[a] joint tortfeasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof"). In his contribution claim, Kramer seeks to shift a share of the $440,000 arbitral award to Nowak. Kramer has not elaborated on the details of the alleged tort, but it seems proper to assume that, in framing his claim as one for contribution, Kramer intends to assert that he and Nowak were joint tortfeasors responsible for a wrong done to their client Lightning Lube.[4]

---

**3.** An investigation into New Jersey law reveals no cases either allowing or rejecting an employer's right to sue an employee for a tort committed within the scope of employment. In the absence of relevant case law, I must determine how the New Jersey Supreme Court would rule. Because the New Jersey Supreme Court has frequently applied the principles embodied in the Restatement (Second) of Agency, *see, e.g., Volb v. Capital Corp.,* 139 N.J. 110, 651 A.2d 1002, 1008 (N.J. 1995); *Abbamont v. Piscataway Bd. of Educ.,* 138

N.J. 405, 650 A.2d 958 (N.J.1994); *Sears Mortgage Co. v. Rose,* 134 N.J. 326, 634 A.2d 74, 79 (1993), I look there for the applicable legal rules.

**4.** If Kramer's theory was that Nowak was solely responsible for the wrong—and that Kramer had been held liable in the malpractice action on a theory of respondeat superior—the claim should have been framed as one for indemnity, not for contribution among joint tortfeasors. *See* Restatement of Restitution § 96 ("A person who,

## A. Choice of Law

■ The contribution claim, like the determination of Nowak's status as employee, must be determined under New Jersey law. In addition to the factors discussed above—that the relationship between the parties was centered in New Jersey, that the employment contract was performed in New Jersey, and that the contract concerned litigation in New Jersey—the contribution claim focuses on a tort allegedly committed in New Jersey, a tort which allegedly injured a corporation located in New Jersey. New Jersey clearly has a strong interest in having its law determine both the content and the consequences of a tort allegedly committed in that state. *See Shields v. Consolidated Rail Corp.*, 810 F.2d 397, 401 (3d Cir.1987) (acknowledging "Indiana's interest in having its law applied to a dispute that concerns the consequences of torts committed within that state").

## B. Application of New Jersey Law

The New Jersey Joint Tortfeasors Contribution Law, N.J.S.A. § 2A:53A–1 *et seq.*, establishes a cause of action for contribution: "The right of contribution exists among joint tortfeasors." N.J.S.A. § 2A:53A–2. For reasons that are not altogether clear, the New Jersey statute does not appear to allow a contribution action between employer and employee. It provides:

> For the purpose of this act, the term 'joint tortfeasors' means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them. *A master and servant or principal and agent shall be considered a single tortfeasor.*

N.J.S.A. § 2A:53A–1 (emphasis added). Because master and servant are deemed to be a "single tortfeasor," not joint tortfeasors, a contribution action would appear to barred between employer and employee.

This provision can sensibly be construed, however, as being intended to apply in situations in which a principal's liability is vicarious only. Suppose a tort is jointly committed against P by A, B, and E, in which each is causally responsible for one-third of the injury. Suppose also that E is an employee of R and was acting within the scope of her employment at the time of the tort. P sues A for negligence and wins a judgment for his entire injury. Under the New Jersey contribution statute, A can sue B and E for contribution. A can also sue R on a theory of respondeat superior liability. In this context, the statement that a principal and agent are to be considered a "single tortfeasor" makes a good deal of sense, because together E and R should only be responsible for the one-third share of the liability caused by E. If the employee and employer were not considered a single unit for apportioning liability, they could face a greater share of the liability than they actually caused. Read in this light, the statement that a principal and agent are considered a single tortfeasor has no bearing on a situation, such as that presented in the case at bar, in which a principal and agent are alleged to have acted as true joint tortfeasors.

The New Jersey Supreme Court, however, has not so interpreted the statute. In *Judson v. Peoples Bank and Trust Co.*, 25 N.J. 17, 134 A.2d 761 (1957), stockholders sued two banks and bank officials based on an alleged misvaluation of stock. The banks cross-complained against their employees for contribution. The employees sought to use the "single tortfeasor" language of the contribution statute as a defense. The court speculated, as I did above, that the "single tortfeasor" language may have "derived from the circumstance that in the usual case the liability of the master or principal is vicarious and hence they are entitled to indemnity from the offending servant or agent." *Id.* 134 A.2d at 771. Nonetheless, the court adopted a different interpretation: "The quoted statutory provision reflects the view that ordinarily a master and servant or principal and agent are a single economic entity and hence

without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, is entitled to indemnity from the other for expenditures properly made in the discharge of such liability."). Because the com-

plaint purports to state a cause of action for contribution, and because Kramer has, in his response to the present motion, defended the claim as such, Kramer's theory appears to be that he and Nowak were joint tortfeasors.

should be so considered in prorating liability." *Id.* Applying this interpretation, the court held that an employee cannot be sued by an employer for contribution unless the employee's tort occurred when he was acting for personal gain. Thus, the court held that a contribution action could proceed against one of the bank employees because he "acted also for his own gain. He personally acquired the sum of $5000 [from the tort] and hence was correctly deemed to be a separate tort-feasor notwithstanding that his conduct served also to implicate his employer." *Id.* 134 A.2d at 772. In contrast, the other bank employee had identical economic interests as his employer, and the two were considered "a single economic entity." *Id.*[5]

Applying the New Jersey Supreme Court's interpretation of New Jersey's contribution statute, Kramer's contribution case must be dismissed unless Kramer can produce evidence that he and Nowak operated as separate economic entities in preparing the prejudgment interest motion. The evidence that has been submitted to date suggests that Nowak's personal stake in the success of the motion was entirely congruent with the success of his employer Kramer and their client Lightning Lube. Like Kramer, Nowak stood to receive a percentage of any recovery in the Lightning Lube litigation. Summary judgment will therefore be granted to Nowak on the contribution claim unless Kramer submits evidence to suggest that Nowak had a stake in the calculation of the prejudgment interest that was independent of Kramer.

## VI. Kramer's Tort Claim

Kramer claims that Nowak tortiously prepared the prejudgment interest motion. The complaint does not describe the nature of this tort. Rather, having stated that Nowak's alleged miscalculation of prejudgment interest should subject him to contribution, the complaint simply declares, "The foregoing conduct constitutes negligence." Complaint, ¶ 11. The complaint fails to outline the basic contours of a tort: what duties were owed by Nowak to Kramer, how these duties were breached, and what injuries Kramer suffered as a result of the breach.

Despite the many failings of the complaint, I construe the negligence allegation as asserting the following: that Nowak, as Kramer's employee, owed Kramer the various duties owed by an agent to his principal.[6]

5. Intermediate New Jersey courts do not appear to have applied the distinction established in *Judson,* and instead have concluded that the contribution statute provides an *absolute* bar to contribution actions between employers against employees. For instance, in *Erlich v. First National Bank of Princeton,* 208 N.J.Super. 264, 505 A.2d 220 (1984), an investor sued a bank and its former employee for malpractice. The bank and the former employee were alleged to have committed acts constituting a joint tort. The court held that because employer and employee are considered to act as a "single tortfeasor," rather than as joint tortfeasors, no cause of action for contribution could be brought in the situation. *Id.* 505 A.2d at 242 (stating that "the Contribution Act considers employer and employee as a single tortfeasor, and the right to contribution would thus not be available in this case"). *See also Dunn v. Praiss,* 271 N.J.Super. 311, 638 A.2d 875, 881 (1994) ("In fact, in apportioning responsibility among joint tortfeasors, a principal and an agent are considered a single tortfeasor."). A federal court sitting in diversity is not bound to follow the interpretations of state law by intermediate state courts unless there is reason to believe that the state's highest court would decide the issue similarly. *In re Asbestos School Litigation,* 46 F.3d 1284, 1293 (3d Cir.1994) (citing *West v. AT & T,* 311 U.S. 223, 61 S.Ct. 179,

85 L.Ed. 139 (1940)). In this case, New Jersey's highest court has already spoken to the issue, and its conclusion, rather than the conclusions of the intermediate courts, provides the most authoritative statement of New Jersey law.

6. Nowak apparently interprets the negligence action as being one for legal malpractice. *See* Def.'s Mem. at 7–8. Kramer, too, suggests that a legal malpractice claim may be what he has in mind. *See* Plaintiff's Mem. at 6–7 (discussing the elements of malpractice and arguing that the complaint alleges these elements). It is clear, however, that Kramer cannot bring a claim against Nowak for legal malpractice because such an action is, with rare exceptions, available only between parties having an attorney-client relationship. *See R.J. Longo Construction Co. v. Schragger,* 218 N.J.Super. 206, 527 A.2d 480, 481 (1987) ("Ordinarily, the existence of an attorney-client relationship is an essential element of a legal malpractice claim."). Nonetheless, as Kramer's employee, Nowak owed Kramer certain duties which may have been breached through the preparation of the prejudgment interest motion. I therefore construe the complaint as alleging that Nowak breached a duty owed directly to Kramer, rather than as alleging that Kramer was injured through the breach of a duty owed to their mutual client.

These duties include what the Restatement of Agency terms the "duty of care and skill." Restatement (Second) of Agency § 379. Under this principle, "a paid agent is subject to a duty to the principal to act with standard care and with the skill which is standard in the locality for the kind of work which he is employed to perform and, in addition, to exercise any special skill that he has." *Id.,* § 379(1). Nowak allegedly violated this duty in calculating the prejudgment interest motion.

The injury Kramer allegedly suffered from Nowak's negligence—the arbitral award against him for malpractice—is identical to the injury at issue in the contribution action. With both claims, Kramer seeks to shift to Nowak a portion of this judgment based on the relative degree of his negligence in the Lightning Lube litigation. The only difference between the two claims lies in the different duties at issue. The contribution action focuses on Kramer and Nowak's purported status as joint tortfeasors who breached the duty attorneys owe to their clients. In contrast, the tort claim focuses on the allegation that Nowak breached the duty an agent owes to his principal.

### 1. Choice of Law

 New Jersey law governs Kramer's negligence claim. As discussed above, the alleged tort occurred in New Jersey, arising out of litigation filed in New Jersey, involving a New Jersey corporation. This choice-of-law conclusion, however, makes little difference to the resolution of this claim, because no New Jersey court has addressed the central question raised by the claim: Under what circumstances, if any, may a partner in a law firm sue an associate for an alleged breach of duty? As discussed below, only two cases have been found on this issue, and neither of these was a New Jersey case.

### 2. Whether a Law Firm Partner May Sue an Associate for Negligence

An attorney's overriding duty is to the client. Thus, the Model Code of Professional Responsibility declares: "The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties." EC 5–1. The Model Rules of Professional Conduct similarly declare, subject to certain exceptions, that "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person or by the lawyer's own interests." MRPC 1.7(b). Because of the importance of the duty owed by attorneys to their clients, a court should be very cautious about concluding that, in representing a client, an attorney may also owe duties to persons other than the client. Kramer's tort claim—alleging that Nowak, in his work for Lightning Lube, breached a duty owed to Kramer—asks this court to recognize a duty owed by subordinate attorneys to their supervisors, the breach of which can subject the subordinate to liability for negligence.

Unfortunately, very few cases have examined whether associates in a law firm may be liable to the firm or the firm's partners for negligence in fulfilling their employment duties. One commentator has stated that "[l]awsuits between associates and law firms are virtually nonexistent, in part because malpractice insurance policies cover both the partners and the associates of the law firm." Leonard Gross, *Ethical Problems of Law Firm Associates,* 26 Wm. & Mary L.Rev. 259, 315 n. 22 (1985). I can find only two cases on point. *Evans v. Steinberg,* 40 Wash.App. 585, 699 P.2d 797 (1985), upheld the dismissal of a claim brought by one lawyer against another. The court stated that the plaintiff "provides no authority recognizing a cause of action in favor of a co-counsel for negligence arising from representation of a mutual client; and we know of none." *Id.* 699 P.2d at 798. This statement is the only relevant discussion contained in the case.

The only case that has examined the question thoroughly is *Pollack v. Lytle,* 120 Cal. App.3d 931, 175 Cal.Rptr. 81 (1981). In *Pollack,* a divided panel of the California court of appeals concluded that an attorney could bring a claim for breach of fiduciary duty and fraud against another attorney he had hired to assist in the prosecution of a medical malpractice claim. In the underlying medi-

cal malpractice litigation, William Pollack represented the plaintiff. During the course of his representation, Pollack realized that the case would require expert testimony from a neurological surgeon. Aware that Pollack was having difficulty finding a surgeon to serve as expert, Robert Lytle approached Pollack and falsely represented that he had a close friend who was a neurological surgeon and who would be willing to testify on plaintiff's behalf on the condition that Lytle be made trial counsel. Pollack agreed to this arrangement. Lytle then bungled the case in a variety of ways, preventing the client from accepting a $250,000 settlement and losing a jury verdict through his trial errors. Following defeat in the medical malpractice action, the plaintiff sued Pollack for legal malpractice. While the legal malpractice suit was pending, Pollack sued Lytle for breach of fiduciary duty, breach of contract, legal malpractice, and for a declaration of a right to indemnity. The trial court sustained Lytle's demurrer and Pollack appealed.

A divided appellate court reversed. The opinion of the court began its analysis by concluding that Lytle had been Pollack's agent in the prosecution of the underlying action. Making liberal use of the Restatement (Second) of Agency, the court then listed the duties owed by agents to their principals: the duty to provide diligent and faithful service, the duty to use reasonable care and skill, and the duty not to compete with the principal. The court found that Lytle's conduct in the litigation had breached these duties. The court also found that this breach had caused Pollack to suffer the following injuries:

> professional embarrassment; impaired reputation; [the plaintiff's] loss of professional confidence in him; the resulting exposure to malpractice liability with the attendant expenses and loss of business which may be attributable to the necessity of defending against [the malpractice] suit ...; and the loss of one-third of the $250,000 settlement offer which he alleges [the plaintiff] would have accepted.

120 Cal.App.3d at 941, 175 Cal.Rptr. 81.

Concluding that ordinary principles of tort and agency law dictated a finding of liability in favor of Pollack, the court then examined whether public policy counseled against imposing liability on an attorney for a breach of duty owed to another attorney. The court found that although an attorney's primary duty must be to the client, this duty was not compromised by imposing liability for breach of the duties owed to the principal attorney:

> Admittedly, [the associate attorney] remains bound to act in the best interests of the client, but this creates no unavoidable conflict. Should he find that the principal attorney's actions to date pose a potential danger to the client's best interests, the agent-associate is duty bound to make the fullest disclosure of these material facts to the principal attorney. Since the principal attorney and the associate each owes the duty of loyalty to the client, the disclosure of information which reveals a potential danger to the client's interests will normally prompt the principal attorney to act in protection of those interests. However, should the principal attorney choose to ignore the client's interests, the agent-associate remains free to terminate the agency relationship and withdraw as associate counsel. Furthermore, the associate attorney's duty to exercise reasonable professional care, skill and diligence on behalf of the client is precisely equivalent to the duty he owes his principal in dealing with the subject matter of the agency. Accordingly, public policy considerations do not mandate that an associate attorney remain free from liability for a breach of the duty owed to his principal. To the contrary, whether associate counsel is brought in from outside the principal attorney's office or is the junior associate in a firm of attorneys, the problems inherent in allowing an agent-associate to act in conflict with or contradiction of the principal attorney are manifest. Holding that an associate attorney owes no duty to anyone but the client would create the potential for a battle of wills over promotion of the client's interests, a situation which could well redound to the client's detriment, for the determination of a client's best interests is at best a subjective value judgment upon which reasonable minds could differ.

Moreover, in view of the principal attorney's liability for the acts of subordinate counsel under the doctrine of respondeat superior, it would be manifestly unfair to relieve an agent-associate of accountability to his principal.

*Id.* at 942–43, 175 Cal.Rptr. 81. The *Pollack* court thus concluded that public policy allows suits between supervising and associate attorneys for three reasons: (1) because no conflict arises between an associates' dual duties to their clients and to their employers, (2) because unnecessary conflicts between associates and partners would arise if associates owed their supervisors no duties, and (3) because imposing liability on associates to partners for the associate's negligence is the necessary corollary to the liability of partners to clients for an associate's negligence.

Dissenting, Justice Johnson concluded that the duty owed by an attorney to a client is unduly threatened by recognizing duties owed by attorneys to their employers. In reaching this conclusion, Justice Johnson drew on a series of cases in which California courts held that an attorney who takes over a case in the midst of litigation owes no duty to the predecessor attorney. These cases arose when the predecessor attorney, sued by the client for malpractice, cross-claimed against the successor attorney for negligence in the subsequent handling of the litigation. In one of those cases, a California court stated:

It is fundamental to the attorney-client relationship that an attorney have an undivided loyalty to his clients. *See* ABA Code of Professional Responsibility Canon 5. This loyalty should not be diluted by a duty owed to some other person, such as an earlier attorney. While, as a practical matter, both the client and the former attorney stand to benefit from any recovery in the client's action, their interests are not identical. . . . It would be inconsistent with an attorney's duty to exercise independent professional judgment on behalf of his client to impose upon him an obligation to take into account the interests of predecessor attorneys.

If the law were to recognize duties, such as are suggested here, between successive attorneys representing the same client, a multitude of litigation could be spawned with an attendant adverse impact on attorney-client relationships. Every lawyer could blame his problems in a lawsuit on his predecessors. Every lawyer referring a case to another lawyer would be in a position to claim that the negligence of the second lawyer caused a meritorious claim to be lost or settled for an insufficient amount. Public confidence in the legal system may be eroded by the spectacle of lawyers squabbling over the could-have-been of a concluded lawsuit, even when the client has indicated no dissatisfaction with the outcome. Considerations of public policy support the conclusion that an attorney's duty of undivided loyalty to his client should not be diluted by imposing obligations to the client's former attorney, or at least obligations greater than the client himself owed to the former attorney.

*Id.* at 946–47, 175 Cal.Rptr. 81 (quoting *Mason v. Levy & Van Bourg,* 77 Cal.App.3d 60, 66–67, 143 Cal.Rptr. 389 (Cal.Ct.App.1978)). *See also Holland v. Thacher,* 199 Cal.App.3d 924, 245 Cal.Rptr. 247 (1988). Justice Johnson then concluded that the rationale for holding that no duty is owed by successor attorneys to predecessor attorneys should preclude acknowledging a duty between principal attorneys and agent attorneys. Under this rationale, the sanctity of the duty owed by an attorney to a client is such that it can brook no additional duties owed by the attorney to anyone else: "By recognizing a fiduciary duty between co-counsel the exposure of attorneys to liability is increased, thus placing them in an untenable position of divided loyalties to their clients and associated counsel." 120 Cal.App.3d at 949, 175 Cal. Rptr. 81.

The *Pollack* majority and dissent disagree over whether the duties owed by attorney to client are exclusive or whether attorneys may owe duties to others—e.g., to their employers—that can be breached through the representation of a client. The majority concludes that there can be no genuine conflicts between the duty an associate owes to the client and the duties owed to the firm; these duties, the court states, are "precisely equivalent." I agree with dissenting Justice John-

son that conflicts of duty are quite possible if attorneys are deemed to owe duties to those other than their clients. For instance, a law firm may choose to devote more resources to cases that appear likely to generate high revenues than to cases with less money-making potential. An associate instructed to devote her time to the high-revenue case may be faced with a conflict between the duty she owes her employer and the duty she owes her low-revenue clients. One commentator has described this conflict: "Although the law firm owes a fiduciary duty to the client, its interest is not coextensive with the interest of the client insofar as the firm seeks to maximize its own profit. The associate is essentially trapped between his duty to the firm and his duty to the client." Gross, *supra*, at 303. *See also* Holland, *supra* at 244 (noting possible conflicts between duties owed by associates to employers and to clients). The *Pollack* majority recommends one solution for this conflict—that the associate facing such a conflict should terminate her employment. But the fact that such a draconian solution may be available does not obviate the fact that there is a substantial potential for conflict between the duties owed to clients and the duties owed to employers.

The conclusion that attorneys may experience conflicting duties owed to employers and clients does not, however, lead to the conclusion that only a duty to clients should be recognized. Under general principles of agency law, an agent may have duties both to the principal and to third persons, such as customers. *See* Restatement (Second) of Agency §§ 320–62 (setting out the duties and potential liabilities of agents to third persons) and §§ 376–431 (setting out the duties and potential liabilities of agents to principals). Employees in many fields, such as medicine, teaching, and psychotherapy, owe strong and legally cognizable duties to those they serve. Recognition of these duties, however, does not mean that employees in these fields owe no duties to anyone else. To hold that an agent attorney owes a duty only to the client, and is not subject to liability to a principal attorney, would be to create an exception to the general principles of agency law that would apparently be unique to the legal profession.

The effect of creating such an exception would be to immunize from liability the torts committed by subordinate attorneys against their employers. Associate attorneys would only need to be concerned with misconduct which rises to the level that a client would regard as malpractice. Yet examples of misconduct performed in legal representation can be imagined in which the primary injury is suffered by the employer, not the client. For instance, an associate blunder in a case generating considerable publicity could cause the law firm to suffer a loss to its reputation more damaging than the harm done to the client. Of course, the threat of termination and the promise of advancement provide associates considerable incentives to perform their jobs well. Yet these incentives are present in all other fields of employment, while employees in other fields also have the deterrent provided by the possibility of suit brought by their employers. Because I can find no reason why lawyer employees—and no others—should be exempt from the possibility of suit brought by their employers, I conclude that, under generally applicable principles of agency, supervising attorneys may sue subordinate attorneys for their negligence in representing clients. Since New Jersey courts follow the general principles of agency as embodied in the Restatement, I conclude that the New Jersey courts would entertain a suit in which a lawyer-employer alleges negligence on the part of a lawyer-employee.

### 3. Whether the Complaint States a Cause of Action for Negligence

The complaint alleges that Nowak negligently prepared the prejudgment interest motion in the Lightning Lube litigation. The uncontested facts are that Kramer delegated this task to Nowak, that Nowak drafted the motion, and that, pursuant to the usual practice between them, Nowak signed Kramer's name to the motion. The parties disagree as to whether Nowak approved the motion before it was filed. While this dispute may be relevant, I do not believe that the negligence claim depends on its resolution.

Although Kramer asserts that he "completely delegated" to Nowak the task of preparing the motion on prejudgment interest, Kramer could not do so, as a matter of law. Rule 11 of the Federal Rules of Civil Procedure, although not directly applicable to this case, establishes a nondelegable duty owed by an attorney who signs a document filed in a federal court to make reasonable investigation into both the law and the facts upon which the document is based. The rule states:

> **(b) Representations to Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defense, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed.R.Civ.P. 11(b). Interpreting this rule, the Supreme Court has concluded that "the purpose of Rule 11 as a whole is to bring home to the individual signer his personal, nondelegable responsibility." *Pavelic & Le-Flore v. Marvel Entertainment Group*, 493 U.S. 120, 126, 110 S.Ct. 456, 460, 107 L.Ed.2d 438 (1989).

In *Pavelic*, the Court held that Rule 11 sanctions may only be imposed on the signing attorney and cannot be imposed on the attorney's law firm. The Court stated that the purpose of Rule 11 is best served by imposing sanctions solely on the signer:

> [J]ust as the court expects the signer personally—and not some nameless person within his law firm—to validate the truth and legal reasonableness of the papers filed, so also it will visit upon him personally—and not his law firm—its retribution for failing in that responsibility. The message thereby conveyed to the attorney, that this is not a "team effort" but in the last analysis *yours alone,* is precisely the point of Rule 11.

*Id.* at 126–27, 110 S.Ct. at 460 (emphasis in original). Although the Court emphasized that only the signing attorney bears responsibility for the motion, the Court explicitly limited its ruling to Rule 11 decisions, stating that its ruling implicated "not reimbursement but 'sanction.'" *Id.* at 126, 110 S.Ct. at 460. Thus, the Court did not address the question whether the signing attorney, although bearing sole Rule 11 liability, may nonetheless bring a negligence action against the subordinate attorney who actually prepared the motion.

Although sanctions under Rule 11 are not at stake in this negligence claim, the rule has some bearing on the claim. Rule 11 contemplates that the filing of the prejudgment interest motion bearing Kramer's signature amounts to an assertion (1) that Kramer made reasonable inquiry into the law and facts, (2) that Kramer believed that the motion was warranted by existing law, and (3) that Kramer believed that the factual assertions had an evidentiary basis. In short, Rule 11 establishes that Kramer's signature amounts to a declaration that Kramer vouched for the reasonableness of the motion. To put this into the language of agency law, Kramer affirmed and ratified Nowak's calculation by authorizing the motion to be filed with the court under Kramer's name. *See* Restatement of Agency §§ 82–104 (discussing effects of a principal's ratification of an agent's negligence). As the Restatement (Second) of Agency states: "*Unless he has been authorized to act in the manner in which he acts,* the agent who subjects the principal to liability because of a negligent or other wrongful act is subject to liability to

the principal for the loss which results therefrom." Restatement (Second) of Agency § 401 cmt. d (emphasis added). It would appear that in delegating to Nowak the preparation of a motion bearing Kramer's signature, Kramer authorized Nowak to act as he did and thus that Nowak is not subject to liability for the preparation of the motion.

One can, however, imagine a case in which the negligence of a subordinate attorney in preparing a motion would not be apparent upon the reasonable inquiry of the signing attorney. It is true that Kramer has neither alleged nor brought forward any evidence to suggest that this is such a case. Indeed, the evidence that Nowak has presented suggests otherwise. According to the affidavits of Nowak and Lightning Lube President Venuto, Kramer's understanding of the law and facts underlying the prejudgment interest calculation was at least the equal of Nowak's. After the motion for prejudgment interest was filed, Kramer could have supplemented the motion with a revised calculation. After Judge Bassler awarded $2 million in prejudgment interest rather than the $4 million sought in the motion, Kramer presumably could have included that issue among the issues that Lightning Lube would press on appeal, but Kramer chose not to do so. This evidence suggests that Kramer approved of the calculation of prejudgment interest at the time the motion was filed, after it was filed, and after the motion was rejected by Judge Bassler. Certainly, when Judge Bassler rejected the calculation of prejudgment interest, Kramer was put on notice that something was amiss with the calculation. It thus appears that Kramer had several opportunities to discover the allegedly negligent nature of the calculation. The evidence that has been submitted supports the inference that Kramer ratified the calculation performed by Nowak and that, as a result, Kramer—and Kramer alone—should bear the responsibility for the alleged miscalculation.

As discussed above, summary judgment is as yet inappropriate because Kramer may have construed plaintiff's motion as one for dismissal rather than summary judgment. In order to survive this motion, Kramer must produce evidence that creates a genuine issue of fact as to (1) whether Kramer ratified Nowak's alleged negligence and (2) whether the miscalculation of prejudgment interest could have been discovered through the reasonable inquiry required by Rule 11. The former addresses the nature of the relationship between Kramer and Nowak—and thus whether, in delegating the task of calculating the prejudgment interest, Kramer authorized Nowak to act as he did, thus relieving Nowak of liability. The latter addresses the difficulty of discovering the miscalculation—and thus whether Kramer violated his nondelegable duty to reasonably investigate the law and facts upon which the motion bearing his name was based.

## VII. Kramer's Breach of Contract Claim

Kramer alleges that Nowak's alleged miscalculation of prejudgment interest constitutes a breach of contract. The complaint does not in any way specify the nature of the contract claim; it does not describe the terms of the contract between the parties or the manner in which the contract was purportedly breached. In his response memorandum, however, Kramer specifies that the contract provision at issue was that "Mr. Kramer specifically instructed Mr. Nowak to compute the interest." Plaintiff's Mem. at 4. Both parties acknowledge that Kramer gave Nowak this instruction. Both parties further acknowledge that Nowak did in fact compute the interest. The only disagreement is whether Nowak negligently computed the interest. The breach of contract claim, therefore, cannot be distinguished from the tort claim because it too centers on Nowak's alleged negligence in preparing the prejudgment interest motion.

*Hofing v. CNA Insurance Co.,* 247 N.J.Super. 82, 588 A.2d 864 (1991) involved a legal malpractice action alleging both contract and tort claims. The court concluded that the claims were indistinguishable and that both would be governed by the same standard:

It makes no difference whether the allegations of the complaint arise out of a breach of contract or tort obligation. The attorney['s] obligation to the client partakes of

both tort and contract. The attorney implicitly contracts to exercise ordinary skill and knowledge in the rendition of professional services. That implied promise is, of course, also the standard of care that determines negligence.

*Id.* at 92, 588 A.2d 864. Although I concluded above, *see supra* note 6, that the tort claim does not amount to a claim of malpractice, the principle stated in *Hofing* applies nonetheless. The standard of care implicated by Kramer's tort claim is identical to the contract claim.

As discussed above, the viability of Kramer's negligence claim depends on whether Kramer can establish a genuine issue of fact as to whether the alleged miscalculation could not have been discovered through reasonable inquiry and as to whether Kramer ratified Nowak's alleged negligence. Because the same negligence standards govern both the tort and contract claims, the viability of Kramer's contract claim similarly depends on Kramer's ability to produce sufficient evidence on these two issues.

### Conclusion

Kramer has produced no evidence from which a factfinder could conclude that Nowak was an independent contractor and not, as the evidence clearly demonstrates, Kramer's employee. Summary judgment is therefore granted to Nowak on this issue. However, this conclusion does not lead to the dismissal of the suit.

The remainder of Nowak's motion will be treated as a motion for summary judgment pursuant to the legal principles described in this opinion. Under the applicable law governing contribution—New Jersey law—in order to survive the summary judgment motion on the contribution claim, Kramer must produce evidence that he and Nowak operated as independent economic entities in the preparation of the prejudgment interest motion. In order to survive summary judgment on the tort and contract claims, Kramer must produce evidence that the miscalculation in prejudgment interest was not discoverable through the reasonable inquiry required by Rule 11 and that Kramer did not ratify Nowak's alleged negligence. Kramer will have two weeks from the date of this opinion to file supplementary materials. If Kramer submits such materials, Nowak will then have one week to respond to them through supplementary materials of his own. Because of this resolution of Nowak's motion, the other arguments raised in his memorandum—involving the statute of limitations, collateral estoppel, and res judicata—will not be examined at this time.